Peelle,J.,
delivered the opinion of the court:
This action is for the reformation of a contract and damages for alleged breaches thereof. The facts are these: In March, 1883, the United States, through Major Benyuard, Corps of Engineers, U. S. Army, advertised for proposals for furnishing stone for the construction of two locks in the Illinois River near Lagrange and Kampsville, Ill. Accompanying the advertisement were the general instructions to bidders and specifications as to quality and dimensions of stone required.
In response to the advertisement the claimants made a bid offering to furnish the stone required for the two locks at the bids named by them, as set forth in finding i. The claimants’ bid being the lowest the same was submitted to the Chief of Engineers, United States Army, who accepted the *62 same, if, in the opinion of the engineer officer in charge, the bid was a reasonable one. The Chief of Engineers, however, in the same letter, directed “ that the contract should not be entered into until the title to the land required for the site of the locks had been secured by the United States and approved by the Attornej^-General.” The contents of the letter' were made known to the claimants on its receipt and they made no objections thereto.
As soon as the title to the land had been acquired the claimants and the United States, through the engineer officer in charge, entered into the contract of August 29, 1883, in which was included only the stone for the Lagrange lock, whereas the claimants in their amended petition aver that the entire stone required for the two locks should have been included in said contract in conformity with the advertisement for proposals, the specifications, and the claimants’ bid, and for that reason it is averred in said amended petition, inter alia, that they are “ entitled to have said contract of August 29, 1883, reformed, so as to make it conform to the intention and agreement of the parties thereto, as expressed in the said invitation for proposals, the bid of claimants submitted in response thereto, and the acceptance thereof as communicated to the defendants or their agents, and to have the same judgment and relief as if the said contract had conformed to the said preliminary agreement and had contained the necessary provisions for all the stone required for the Kampsville lock as well as for the Lagrange lock.”
The facts found fail to disclose any mistake on the part of the United States in thus entering into the contract, while on the part of the claimants the facts set forth in finding hi show that neither “ at the time the first ’contract named above (August 29, 1883) was entered into, nor at any subsequent period, did the claimants' claim or demand the right to contract for the entire work of both locks in the same contract.”
The mere fact that said contract of August 29, 1883, embraced only the stone for the Legrange lock, when the bid accepted covered the stone for both locks, can not be held to have been a mutual mistake, especially when the claimants *63 knew that such was the course of the Government in making contracts for such works, and no demand or claim otherwise was made at the time of signing said contract. This being so, we need not consider the question raised by the defendants as to whether the court, under its general jurisdiction, has the equitable power to enter a decree re-forming the contract..
The claimants, however, further contend, by the averments in their original petition and in their brief, that -when their bid was accepted in response to the advertisement for proposals, a contract was thereby formed for the entire work and that therefore the several contracts subsequently entered into should be considered as one document or instrument embodying the whole work so covered by their bid, and this contention, they claim, finds support in the cases of Garfielde v. United States (93 U. S., 242, 244); Hawkins v. United States (96 U. S., 689, 694), and Harvey v. United States (105 U. S., 671).
In the first of the cases cited, which was a contract made through the Post-Office Department for conveying the mails, the court, respecting the contract, said: “ The Court of Claims holds that the proposal on the part of Garfielde, and the acceptance of the proposal by the Department, created a contract of the same force and effect as if a formal contract had been written out and signed by the parties. Many authorities are cited to sustain the proposition. We believe it to be sound, and that it should be so held in the present case.”
In the Hawkins case, which arose under a contract made by the Secretary of the Treasury under a special act of Congress (17 Stat. L., 390), the court said: “Aid in the construction of the contract may be derived from the advertisement under which the bids were received, as the advertisement is expressly referred to in the written contract.”
In the Iiaroey ease, which was a contract made through the War Department for the construction of a bridge at Rock Island, Ill., a claim for which, was referred to the court under a special act (19 Stat. L., 490), the court said: “ The written bid in connection with the advertisement, and *64 the acceptance of that bid, constituted the contract between the parties so far as regards the question whether the contract prices embraced the cofferdam work.”
In the case of South Boston Iron Co. v. United States (118 U. S., 37-42) a letter had been addressed to the Secretary of the Navy proposing to construct new boilers for certain vessels of the Navy, which offer was accepted by the Navy Department by letter and the proposed contractor was informed that drawings and specifications would be furnished as soon as possible. But a few days later he was notified to discontinue all work contracted for by him Avith the Department. The action Avas sought to be founded upon the letters as constituting a contract, but in respect thereto the court, speaking by Chief Justice Waite, said: “In Clark v. The United States (95 U. S., 539) it Avas decided that, to bind the United States, contracts by the Navy Department must be in writing and signed by the contracting parties. Such, in the opinion of the court, was the effect of the act of June 2, 1862 (12 Stat., 411, ch. 93), uoav in force as sections 3744-3747 and sections 512-515 of the BeAdsed Statutes. An effort has been made in this case to sIioav a contract in Avriting, but Ave agree entirely with the Court of Claims (hat the papers relied on for that purpose are nothing more in laAv or in fact than the preliminary memoranda made by the parties for use in preparing a contract for execution m the form required by law. This Avas never done, and therefore the United States never became bound. Within a A^eiy feAv days after the memoranda were made the Avhole matter was abandoned bjr the Department, and the iron company has neither performed any of the Avork Avhich Avas referred to, nor has it eA^er been called on to do so.” Such also Avas the decision of this court in the case of Chapter of Calvary Cathedral v. United States (29 C. Cls. R., 269).
Undoubtedly the first element essential to the formation of a contract is a distinct communication between the parties — i. e., an offer by one and acceptance thereof by the other. This done the question is as to the form and con-, sideration of the contract the parties have outwardly con *65 stituted, as the written instrument is the evidence of the contract the parties have thus formed; but in respect to contracts made with the Government through the War, Navy, and Interior Departments that rule was changed by the act of June 2, 1862, supra, Eevised Statutes, section 3T44 of which provides: “ It shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior to cause and require every contract made by them severally on behalf of the Government, or by their officers under them appointed to make such contracts, to be reduced to writing and signed by the contracting parties with their names at the end thereof; * *
It is further provided in that act that the officer making such contract shall file a copy thereof, after verification by his oath, in the returns office in the Interior Department, and for his failure to make such return he is declared to be guilty of a misdemeanor.
It will thus be noted that the terms agreed upon between the parties by their offer and acceptance, though sufficient to constitute a contract as between individuals, are not sufficient to charge the Government under the act of June 2, 1862. Hence, to bind the Government, the terms so agreed upon must be embodied in a written contract and be signed b)r the parties. The written instrument thus signed becomes the contract between the parties and is as well the evidence thereof.
In construing that act the court, in the case of Clark v. United States (95 U. S., 539, 541), said: “The Court of Claims' has heretofore held the act to be mandatory and as requiring contracts made with the Departments named to be in conformity with it. The arguments by which this view has been enforced by that court are of great weight, and, in our judgment, conclusive.” And in speaking of the purpose of the act, the court further said: “ Perhaps the primary object of the statute was to impose a restraint upon the officers themselves and prevent them from making reckless engagements for the Government; but the considerations referred to make it manifest that there is no class of cases in which a statute for preventing frauds and perjuries is more *66 needed than in this. And we think that the statute in question was intended to operate as such. It makes it unlawful for contracting officers to make contracts in any other way than by writing, signed by the parties. This is equivalent, to prohibiting any other mode of making contracts. Every man is supposed to know the law. A party who makes a. contract with an officer without having it reduced to writing is knowingly accessory to a violation of duty on his part. Such a party aids in the violation of the law. We are of the opinion, therefore, that the contract itself is affected, and must conform to the requirements of the statute until it jiasses from the observation and control of the party who enters into it * *
The ruling in that case seems decisive of the present case. However, if we should consider that the advertisement with the specifications, the proposal and its acceptance constituted the contract between the parties entitling the claimants to furnish all the stone thereunder or to have all the stone embraced in the first-written contract, still we would have to hold that, within the terms of the accepted proposal, it was competent for the parties to sever the work to be done into two or more contracts, and that course having been pursued by the parties without objection from the claimants, the court holds that the written contracts entered into between the parties must be looked to in determining the liability of the United States.
The findings show that neither at the time the first contract [August 29, 1883] was entered into, nor at any subsequent time, did the claimants demand or claim the right to contract for the entire work of both locks in the same contract. On the contrary, it is shown by the findings that prior to the claimants’ bid for the work embraced in the contracts in this case the claimants had been contracting with the United States at different points at various times, whereby they had made bids for an entire work or building, and thereafter entered into two or more separate contracts for such portion of the work as was required by the engineer officer in charge, dependent upon the appropriations available therefor.
*67 The claimants were bound to know that no contract for the construction of public works on behalf of the United States could be made unless the same was authorized by law or was under an appropriation adequate to its fulfillment. (Rev. Stat., sec. 3732.) And further, that “ No Department of the Government shall expend, in any fiscal year, any sum in excess of appropriations made by Congress for that fiscal year, or involve the Government in any contract, for the future payment of money in excess of such appropriations.” (Rev. Stat., sec. 3679.)
Turning iioav to the claims arising under the contract of August 29, 1883, for the cutting and recutting of stone for the Lagrange lock to a higher grade of finish, as the claimants contend, than was required by the specifications, we must examine the contract and specifications.
The specifications, paragraphs 5 to 9, inclusive, classify the stone to be used and prescribe what each class shall cover, while paragraph 21 of the specifications provides:
“ 21. The beds and joints of all cut stone and special stone will be cut smooth with pick point or stone ax; and no deviation from a true plane exceeding one-eighth of an inch will be allowed.”
Under the heading of “ Inspection,” the specifications material to this case provide:
“ 34. The United States have the right and privilege to appoint an inspector to examine and to report upon any material, work, or workmanship pertaining to the work, who will receive instructions from the assistant engineer. The inspector shall have the power to object to any material, work, or workmanship, and any material, work, or workmanship objected to by the inspector shall be kept out of or removed from the place of delivery, unless in each particular case the objections of the inspector shall be overruled by the assistant engineer or engineer officer in charge; and unless the objections be so overruled, no estimate or payment shall be made until such material, work, or workmanship be so removed.
“ 35. The decision of the United States engineer officer in charge shall be final and conclusive upon all matters relating to the work and upon all questions arising out of these specifications, and from his decision there shall be no appeal.”
*68 The contract entered into between the parties makes the advertisement and specifications a part thereof, and after describing the stone to be used and the price to be paid therefor, further provides:
“All materials furnished and work done under this contract shall, before being accepted, be subject to a rigid inspection by an inspector appointed on the part of the Government, and such as does not conform to the specifications set forth in this contract shall be rejected. The decision of the engineer officer in charge as to quality and quantity shall be final.”
It will thus be noted that before being accepted the materials furnished and work done under the contract shall “ be subject to a rigid inspection ” by a Government inspector, and such materials and work as do not conform to the specifications “shall be rejected;” and in respect thereto the contract further provides: “ The decision of the engineer officer in charge as to quality and quantity shall be final.” In respect to similar provisions of contracts the courts have held that in the absence of fraud or of such gross error as would necessarily imply bad faith, the decision of such officer is final and not subject to review. (Ogden v. United States, 60 Fed. Rep., 127; Kihlberg v. United States, 97 U. S., 398; Sweeney v. United States, 109 U. S., 618; Mart-insburg and Potomac R. R. Co. v. United States, 114 U. S., 549; Chicago, etc., R. R. Co. v. Price, 138 U. S., 185; United States v. Gleason, 175 U. S., 588; United States v. Barlow, 184 U. S., 123-134.)
As the findings show that the decision of the engineer officer in charge appeal’s to have been in the exercise of an honest judgment, no fraud can be attributed to him, nor do we think it was gross error on the part of such officer in requiring the stone to be cut as required by the specifications, though it required other tools than those mentioned in the specifications with which to do it. But we need not go further on this branch of the case as the findings show that all the stone contracted for under the contract for the Lagrange lock was furnished to and paid for by the United States, the last payment therefor having been made August 1, 1885, more than six yuars before the filing of the petition *69 herein, and hence all claims arising under that contract are barred by the statute of limitations.
As to the claim for the squared stone omitted from the Kampsville lock, as set forth in finding vi, there can be no recovery, for the reason that while the amount of squared and backing stone estimated for in the specifications was 9,000 cubic yards, the plans were changed by reducing the width of the walls, thereby necessitating a reduction in the quantity of stone required before the execution of the contract of September 25, 1888, under which the work was performed, so that when the contract ivas executed it provided only for 6,171 cubic yards rough stone, and that amount the findings show was furnished, used, and paid for.
The claimants in effect contend that notwithstanding the quantity of stone was approximated in the specifications, still on the basis of the original plans the Kampsville lock would have required the full amount of 9,000 cubic yards so estimated, and that as the reduction in the quantity was by reason of the change in the plans made subsequent to their bid, they are entitled to recover.
This contention is based on the theory that when the claimants’ bid was accepted a contract, binding on the United States, was thereby formed. But the answer to this is, as we have before stated, that the act of June 2, 1862 (supra), requiring cohtracts to be reduced to writing and signed by the contracting parties, is mandatory. (Clark v. United States, 95 U. S., 539-541.) Hence the liability of the United States must be determined, not by the preliminary negotiations between the parties, but by the written contract into which the preliminary negotiations, including the change in the plans and the reduction of the quantity of stone, were merged. (Simpson v. United States, 172 U. S., 372-379; Brawley v. United States, 96 U. S., 168-173; De Witt v. Berry, 134 U. S., 306-315, and authorities there cited; Oelricks v. Ford, 23 How., 49-64.)
If, however, we were to assume that the advertisement, the specifications, and the claimants’ bid and acceptance thereof constituted the contract, as the claimants contend, still when they thereafter entered into the formal written contract the *70 presumption is that the provisions contained therein superseded all previous negotiations and contracts relating to the same subject. (Northern Assurance Co. v. Building Association, 183 U. S., 308-318, and authorities above cited.)
The claimants having furnished the stone and the United States having paid therefor according to the contract, the ruling in the case of United States v. Garlinger (169 U. S., 316-323) appears applicable. In that case, where payments had been .made to an officer for a series of years without objection or protest, the court said:
“ We do not want to be understood as saying that the mere fact of receiving money in payment will estop a creditor. But where, as in this case, the payments were made frequently, through a considerable period of time, and were received without objection or protest, and where there is no pretense of fraud, or of circumstances constituting duress, it is legitimate to infer that such payments were made and received on the understanding of both joarties that they were in full. Such a presumption is very much strengthened by the lapse of two years before the appellee thought fit to make any demand.”
In the present case, notwithstanding the claimants’ contention that the work on the two locks was delayed through the fault of the Government for nine years, and that most of their claim arose under the first and only contract for the construction of the Lagrange lock between August, 1883, and August, 1885, they delayed bringing any action until March, 1895, or more than two years after the last payment was made to them under their last contract.
The contract having been discharged bjf performance by both parties no further liability arises thereunder, and as the change in the plans necessitating the reduction .in the quantity of stone occurred before the execution of the contract, which was made with reference thereto, no liability arises on an implied contract for a quantum meruit for the stone that was excluded from the contract and not used by the Government.
In the case of Clark v. United States (supra), relied upon by the claimants for a recovery, on quantum meruit there was no written contract and for that reason the court held in substance that where the property or services of an indi *71 vidual were taken, and the United States received the benefit thereof, such individual would be entitled to recover the fair value thereof as upon an implied contract for a quantum meruit. In other words, where the Government receives the benefits of the property or services of an individual the party so furnishing should not be denied the right of reasonable compensation therefor, because the- formalities of the act of June 2, 1862, had not been complied with. But that'decision does not apply where the quantity of material, determined by the engineer officer in charge, is made part of the written contract as in the present case. The contract having been reduced to writing and signed by the contracting parties the liability of the Government must be measured thereby.
There is no contention here that after the execution of the contract there was any oral agreement entered into between the ¡parties as to any matter about which the contract was silent, and hence the. ruling in reference thereto announced in the case of Seitz v. Brewing Co. (141 U. S., 510-517), to the effect that the existence of a separate oral agreement as to any matter on which a written contract is silent and which is not inconsistent with its terms may be proven by parol, does not apply.
Had the plans been changed and the quantity of stone reduced after the execution of the written contract a different question would then be presented, but such is not the present case.
Nor is the Government liable for the deterioration of machinery by reason of the delays in the transaction of the work, even if such deterioration occurred within six years from the date of the filing of the petition herein, as such delays were without the fault of the United States other than the failure of the Congress to make the necessary appropriations of money with which to pay for the work, and for such delays the United States can not be held liable.
By reference to finding vi it will be noted that the claimants in their letter of September 8, 1892, when they signed the vouchers for the final payment under the last contract of February 10, 1891, claimed only for “ extra work ” there *72 tofore performed and for losses occasioned “ by delay of work.” These were the only claims asserted by the claimants when the final payment was made under said last contract, and what was not then claimed the court may fairly presume was waived. No claim was then asserted or reserved for losses growing out of the omission of the squared stone' from the Kampsville lock.
For the reasons we have given the claimants are not entitled to recover and their petition must be dismissed.